## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAMIE KATHLEEN STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3193 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jamie Kathleen Stone appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Stone filed a Motion for Summary Judgment (d/e 17). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 21). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered February 5, 2018 (d/e 16). For the reasons set forth below, the Decision of the Defendant Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Stone was born on February 1, 1969.  She earned a GED.  She previously worked in a bookstore.  She suffered from a history of hernia repairs, obesity, migraines, depression, anxiety with obsessive-compulsive behaviors, borderline personality disorder, degenerative disc disease, and post-traumatic arthritis of the right ankle.  She last worked in February 2013.  She filed her application for Disability Benefits on February 3, 2014.  She alleged that she became disabled on February 7, 2013.  <u>Certified Transcript of Proceedings before the Social Security Administration (d/e 10, 11, and 12) (R.)</u>, at 12, 46, 74-75, 245, 250, 287.

Stone has focused her appeal on evidence related primarily to her limitations due to her mental impairments, as well as the ALJ giving no weight to opinion evidence from Plaintiff's treating physician Dr. Schmidt and her treating therapist Ron Kanwischer.  <u>See</u> <u>Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 18) (Stone Brief)</u>, at 9-17.  The Court's statement of the facts, therefore, will focus on the evidence relevant to the issues raised in the appeal.  Stone's extensive medical records show that beginning in April 2012, Stone saw many physicians, primarily residents, at the Southern Illinois University Clinics (SIU) in Springfield, Illinois.  She primarily went to the Psychiatry and Family

Medicine clinics. The psychiatry residents evaluated her and prescribed anti-depression, anti-anxiety, and other psychotropic medications. Certain residents in the Family Medicine clinic provided primary care. On March 9, 2015, Stone began seeing Dr. Kenneth Schmidt, M.D. as her primary care provider. Dr. Schmidt was not associated with SIU.

Stone complained to her primary care physicians primarily about back pain, right ankle pain, and abdominal pain. The doctors treated her most often with oxycodone and flexeril. The doctors also on occasion prescribed dilaudid, fentanyl, and other pain medication.[1] The doctors examining and treating Stone ordered numerous tests such as x-rays, MRI, CT scans of Stone's back, ankle, and head. The scans were unremarkable generally except for the evidence of the past trauma to her ankle, a possible hiatal hernia, gastric polyps, and a history of abdominal hernia repairs. See R. 83-84; R. 412; R. 634; R. 690-91; R. 800; R. 821; R. 872; R. 934; R. 937-38; R. 952-53; R. 1340; R. 1355; R. 1377-78. The CT scans in 2013 and 2014 showed a possible early recurrence of an abdominal hernia adjacent to the repair. No surgical intervention was recommended at the time. R. 1340.

---

[1] Stone had an adverse reaction to fentanyl and stopped using it. See R. 1268.

Stone also went to the emergency room at St. John's Hospital in Springfield, Illinois (St. John's), 36 times between August 2012 and August 2014. She also went to emergency rooms several times thereafter. She complained primarily of migraine headaches and abdominal pain. She usually asked for dilaudid administered intravenously. The physicians sometimes gave her dilaudid, but other times refused. The physicians most often prescribed oxycodone, muscle relaxers, and medications for migraines. The St. John's emergency room physicians referred her to a pain management clinic in August 2014.

The statement of facts below reflect primarily the records from mental health professionals, opinion evidence, statements by Stone and her husband Jerry Stone, and records cited in the Stone Brief.

On April 12, 2012, Stone saw psychiatric resident Dr. Seleena Shrestha, M.D. for medication management. R. 536-38. At that time, Stone was diagnosed with major depressive disorder recurrent in partial/unspecified, remission; obsessive-compulsive disorder (OCD); general anxiety disorder; and possible borderline personality disorder. R. 536. Stone reported that she felt overworked at the bookstore. She said her OCD was under control and her current medications controlled her anxiety well. She also stated that she was worse. She said she got panic

attacks on the days she had to work.  She felt sad and unappreciated at work.  She had no changes in sleep patterns or appetite.  On examination, Stone's speech was normal, her insight and judgment were good, her affect and mood were constricted, her mood was irritable, and her thought processes were linear/goal-directed.  She had no suicidal ideations.  Dr. Shrestha noted that a relapse of her depression is "eminent (sic)."  R. 536-37.

Dr. Shrestha assessed a Global Assessment of Functioning (GAF) score of 60.  R. 536.  A GAF score is an assessment of the overall level of functioning of an individual.  A GAF score of 51 to 60 indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR), at 34.  The American Psychiatric Association no longer recommends the use of GAF scores.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

On November 28, 2012, Stone saw SIU attending psychiatrist, Dr. Khondakar Abul Hasanat, M.D., for medication management.  R. 544-46.  Stone reported that she was doing okay, except for some issues at work that depressed her.  She said that she felt better after work issues were

resolved.  She denied problems with sleep or appetite.  Dr. Hasanat mentioned the possibility of dialectical behavioral therapy (DBT).  Stone reported having thoughts of cutting herself when she has problems with low moods.  Stone indicated she became angry and that she made only superficial cuts and had no intent to kill herself.  She reported that her cutting behavior has improved over the years.  She denied any suicidal or homicidal ideations.  She said she had no side effects from her medications.  R. 544.  On examination, Stone had fair insight and judgment.  Her speech was normal.  Her affect was reactive and her mood was dysphoric.  Her thinking was linear/goal-directed.  R. 545.  Dr. Hasanat diagnosed depression major recurrent moderate, general anxiety disorder, and possible borderline personality disorder.  Dr. Hasanat assigned a GAF score of 60.  R. 544.  Dr. Hasanat renewed her prescriptions.  R. 545.

On February 27, 2013, Stone saw an SIU psychiatric resident, Dr. Stephen M. Soltys, M.D. for medication management.  R. 547-48.  Stone complained of problems sleeping, both falling asleep and staying asleep.  She reported feeling depressed because of her sleeping problems, back pain, and inability to work.  She reported having some anhedonia, but could still enjoy some television programs.  She said she had poor energy.  She said she had not had thoughts of cutting herself for the last few months.

On examination, Stone's speech was normal, her insight and judgment were fair, her affect was restricted/blunted, and her mood was dysphoric. Stone's thought process was linear/goal-directed. R. 548. Dr. Soltys diagnosed depression major recurrent moderate, and borderline personality disorder. Dr. Soltys assigned a GAF score of 58. Dr. Soltys prescribed trazodone to help her sleep. R. 547-48.

On April 10, 2013, Stone saw Dr. Soltys for medication management. Stone reported that she was doing better. She reported that she was tapering off sertraline and trazodone. She said she was sleeping better. She said her mood was better because she was not going to work. She said she was off work due to back pain. She said her energy level was better and she was more upbeat. R. 549-50. On examination, her speech was normal, her insight and judgment were fair, her affect was constricted, her mood was euthymic, and her thought processes were linear/goal-directed. Dr. Soltys diagnosed, depression major recurrent moderate, general anxiety disorder, borderline personality disorder, and he assigned a GAF score of 60. R. 549.

On May 4, 2013, Stone saw family medicine Dr. Pradeep Murthaiah, M.D., for a recheck of her thyroid medication. Stone reported that her dizziness improved after restarting Zoloft. She reported that she was tired

all the time and lacked energy. Dr. Murthaiah noted that Stone had a depressed and flat affect. Dr. Murthaiah adjusted her medication and ordered blood tests. R. 770, 774.

On June 7, 2013, Stone saw physician's assistant Zachary Sims, PA-C. R. 811. Stone reported increased agitation, depression, and anxiety. She stated, "I would just assume beat somebody's ass." R. 811. On examination, Stone's gait and stance were normal. She was alert and cooperative. She had an anxious mood, was teary eyed, and had normal attention and concentration. R. 814.

On July 24, 2013, Stone telephoned the office of orthopedic surgeon Dr. Khaled Saleh, M.D. requesting an appointment for her foot pain. The note from the person who received the call stated that Stone was very rude because she could not get in to see Dr. Saleh as soon as she would like. R. 1356.

On July 31, 2013, Stone telephoned Dr. Saleh's office again. Stone left a very rude voicemail accusing the recipient of the call with fraud. The note stated that Stone had five previous appointments with doctors in the SIU orthopedic department that she either canceled or failed to appear. R. 1356.

On August 14, 2013, Stone saw nurse practitioner Airn Etherton for abdominal pain. R. 806-10. Etherton gave Stone a "GI cocktail," but Stone reported that the medication did not provide any relief. Stone also complained of back pain. Stone said her oxycodone prescription was cut back from three pills per day to one pill per day. Stone said "that is bullshit" and requested the prescription be changed back to three pills per day. R. 897. Etherton noted that Stone had an appointment with her primary care physician, family medicine resident Dr. Gultasib Gill, M.D., the next day. On examination, Stone moved on and off the examination table without difficulty. Stone was obese. Stone had normal gait and normal strength. Stone had mild lumbar paraspinal tenderness. Stone was anxious and easily upset and agitated. Etherton ordered blood and urine tests. R. 809.

On August 15, 2013, Stone saw Dr. Gill, again complaining of back pain and abdominal pain. R. 794-99. Stone stated that she could not function because of the pain. She said that she would rather kill herself then live with her current pain. R. 794. Stone said she wanted to cut herself if she continued in this amount of pain. On examination, Stone moved on and off the examination table without difficulty. She had a normal gait. She had mild lumbar paraspinal tenderness, but no spinal tenderness. Stone was anxious and easily upset. She was tearful due to

the pain.  R. 798.  Dr. Gill ordered a CT scan of Stone's abdomen.  Dr. Gill increased Stone's oxycodone prescription to three pills per day.  R. 794. Dr. Gill referred Stone for pain management.  R. 798.

On September 4, 2013, Stone saw Dr. Gill for abdominal pain and back pain.  R. 785-89.  Stone said that oxycodone was not working to relieve her pain.  She wanted dilaudid.  She said the dilaudid was the only medicine that worked.  R. 786.  On examination, Stone moved on and off the examination table without difficulty.  She had a normal gait.  She had some lumbar paraspinal tenderness and some tender points in her upper back.  Dr. Gill's attending physician Dr. Christopher Gleason, M.D., spoke to Stone.  Dr. Gleason offered to increase Stone's prescription for flexeril, but would not prescribe dilaudid.  Dr. Gleason noted that Stone was quite upset about this.  Stone reported that her abdominal pain had improved over the last three weeks.  Dr. Gleason noted that he would arrange a referral for a general surgery evaluation.  R. 789.

On October 2, 2013, Stone saw Dr. Gill.  R. 775-79.  Stone complained of fatigue, chronic pain, and decreased sleep due to back pain, abdominal pain, and headaches.  R. 776.  On examination, Stone had some tenderness in the right upper quadrant and left lower quadrant of her

abdomen.  Stone was alert and cooperative, but tearful whenever talking about her pain.  R. 778.

On February 28, 2014, a Social Security Administration interviewer conducted an intake interview of Stone by telephone.  R. 245-47.  Stone had trouble answering questions.  Stone started crying several times during the interview.  R. 246.

From March 7-11, 2014, Stone was hospitalized for her abdominal pain.  She received a complete workup to ascertain the cause of her condition.  R. 886-933.  The examination results failed to physically show a cause for the pain.  R. 886.  The SIU general surgery department reviewed Stone's prior surgical repairs of past hernias, but did not find a need for any additional surgical repairs.  R. 886.

On March 7, 2014, while in the hospital, Stone saw Dr. Benjamin Rejowski, M.D. for a follow-up on numerous emergency room visits for abdominal pain.  R. 951-53.  Stone reported the abdominal pain was constant.  She rated her pain as a 4 on a 1-10 scale.  Stone reported off and on vomiting lately. She received pain medication the night before in the emergency room.  Thereafter, her pain was better.  R. 951.  On examination, Stone's abdomen had mild tenderness on deep palpation. Her neurological examination was normal.  Her mood and affect were

appropriate. She looked "a little anxious." R. 952. R. Rejowski prescribed protonix. R. 953.

On March 10, 2014, while in the hospital, Stone saw psychiatric resident Dr. Bhavin V. Sonani, M.D., for a psychiatric consultation. R. 896-902. Stone said that her depression and anxiety symptoms had been stable for four years while taking Zoloft. R. 896. On examination, Stone was alert and oriented. She was cooperative and in no physical distress. Dr. Sonani noted some psychomotor retardation. Stone spoke softly at a normal rate and volume. Stone had a depressed mood and blunted affect. Stone's thought process was linear. Her insight and judgment were fair. Dr. Sonani diagnosed major depressive disorder moderate, obsessive-compulsive disorder, and borderline personality disorder. R. 900. Stone agreed with Dr. Sonani that if the physical workup of her abdominal pain during her hospitalization was negative, then her pain had "the component of her psychiatric illness related to it." R. 901. The physical workup was negative. See R. 901-04.

On April 26, 2014, Stone completed a Function Report-Adult form R. 262-72. Stone described her activities of daily living (ADL) on this form. Stone lived in a house with her family. She stated that her back went into spasms "all the time." She reported that she felt like her brain was "broke."

She stated that she could no longer multi-task. She stated that she became overwhelmed and "spent time on the phone crying to my pastor." She said the thought of running a register at the bookstore or emptying a shopping cart made "her want to die." She stated that her ankle swelled and a bone chip in her ankle made "it get stuck in place." She said she would "get so upset that I started cutting myself again. I haven't cut since I stopped working." R. 262.

Stone stated that she spent her days sitting and watching the television or the computer. She said she made plans to go to the store but does not go. She said she sometimes sat on the porch. She said she fed the family cat. Stone said she did not sleep at night, and she slept only a few hours during the daytime. Stone said she wore the same thing for several days because she did not go anywhere. She washed her hair once every five to six days. She said drying and straightening her hair was too tiring. R. 263.

Stone did not need reminders to take medication and to take care of her personal hygiene. Stone said she reheated leftovers and made sandwiches, but her husband Jerry Stone did all the other cooking for the family. Jerry Stone also did all the shopping. Stone said she vacuumed, washed dishes, and dusted. Jerry Stone helped her when she had spasms

or was "just too blah to get my fat self up." R. 264. Stone said she did not do any yardwork. R. 265.

Stone said she went out of the house once a week. She said she was able to drive. She said that she could go out by herself, but did not. She shopped a little online, primarily to buy gifts for family. Stone said paying bills was overwhelming. She said she could not sit and go through the bills. She said she felt like a "loser." R. 265. She said her husband Jerry Stone paid the bills. R. 266.

Stone said her best friend came over and visited once a week. She said she needed to be reminded to go to doctors' appointments. She said she went alone to doctors' appointments. R. 266. Stone said she had trouble getting along with others. She said that if the neighbor's dog barked too much, she called the police because the noise made her "feel like I'm going nuts." She stated, "People can really piss me off. I'd love to bash their faces in. I call my Pastor often." She said she used to be very active at church and work and had many friends. She said now she did nothing. R. 267.

Stone stated that she could not "do a lot of moving around & lifting because of my ankle and back." She said that she could walk half a block before needing to stop and rest. She said her ability to pay attention

depended on whether she had a headache. She said she finished what she started. She said she could follow written instructions. She said spoken instructions confused her. She said she often forgot the instructions and had to ask the person to repeat the instructions multiple times. She said that she got along with authority figures. She did not handle stress or changes in routine well. She said, "I get easily angered and would enjoy pounding someone's face in." Stone reported that she used a cane when her "ankle sticks." R. 268. Stone said that she could sit for at least two hours at a time without having to stand or walk. R. 272.

On April 27, 2014, Stone's husband Jerry Stone completed a Function Report-Adult-Third Party form. R. 276-83. Jerry Stone said that he lived with his wife Stone. Jerry Stone said that Stone was limited in her ability to work because her ankle did not heal right after surgery, her back pain, her anxiety, and her insomnia. R. 276. Jerry Stone said that Stone watched television and used a computer. He said she slept at odd hours because of her back pain and her insomnia. R. 277. Jerry Stone stated that Stone warmed up leftovers and made sandwiches, but he did all the other cooking. He said Stone vacuumed, dusted, and swept the kitchen. R. 278.

Jerry Stone reported that Stone could go out alone and she drove. He also said she did not go out because she felt anxious. She did not go shopping much. He paid the bills. R. 279. Jerry Stone said that Stone watched television, worked puzzles, read the paper, and played games with her daughter. He said that friend came over for dinner once a week. He said she went out about once a month. R. 280.

Jerry Stone indicated his wife had a short temper "if things don't go her way." He said that she had no social activities. Jerry Stone attributed Stone's physical and mental limitations to her weight, bad knees, bad back, and bad ankle, Grave's disease, and a head injury that occurred when she was hit in the head with a shotput. Jerry Stone opined that she could walk half a block before needing to rest for 15 minutes. He said that she finished what she started, and could follow written instructions. Whether she could follow spoken instructions depended "on how you explain it to her." R. 281.

Jerry Stone said that his wife could not handle stress well, but could handle small changes in routine well. Jerry Stone said that she used an electric scooter to get around. He noted that the doctor prescribed it. She used the scooter when she went to places where she would need to walk a long time. R. 282.

On July 17, 2014, Stone saw state agency psychologist Dr. Michael Trieger, Psy.D., for a psychological evaluation.  R. 958-61.  Stone said that she had mood disorders for many years.  She said she had a turbulent relationship with her mother.  Stone reported longstanding problems with anxiety and obsessive-compulsive disorder.  She tried numerous psychotropic and hypnotic medications without benefit and reported prior history of alcohol and marijuana abuse. "However, she stated that marijuana was very soothing and curbed her irritability."  R. 959.

On examination, Stone was cooperative and intermittently tearful throughout the interview.  She had normal speech and her statements were relevant, coherent, and adequately organized.  She was oriented. Her recent memory was intact.  Her judgment was impulsive.  She had a good ability to comprehend verbal abstractions.  Her attention and concentration were adequately focused during the interview.  Stone expressed feelings of anger and dissatisfaction throughout the interview.  Dr. Trieger diagnosed major depressive disorder, recurrent, and anxiety disorder with obsessive-compulsive behaviors.  Dr. Trieger assigned Stone with a GAF score of 51. R. 960-61.

On June 26, 2014, state agency psychologist Dr. Howard Tin, Psy.D., prepared a Psychiatric Review Technique and a Mental Residual

Functional Capacity Assessment.  R. 109-10, 112-15.  Dr. Tin opined that Stone had affective disorders (depression), and anxiety disorders.  Dr. Tin also opined that Stone had mild restrictions on daily activities, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  Dr. Tin noted that Stone had no episodes of decompensation of extended duration.  R. 109.

Dr. Tin opined that Stone was moderately limited in her ability to carry out detailed instruction, to maintain attention and concentration for extended periods, and to work in coordination with or in proximity to others without being distracted.  Dr. Tin indicated that Stone was moderately limited in her ability to interact with the public, and to set realistic goals or make plans independently of others.  R. 113-14.  Dr. Tin opined that Stone could remember locations and work-like procedures, and could understand, remember, and carry out short simple instructions, but could not carry out detailed instructions.  He additionally opined Stone could not handle stress or changes in routine well. He stated she could only perform work that did not require interaction with the public.  He opined she could respond appropriately to changes in work settings and could perform unskilled work. R. 114.

On June 30, 2014, state agency physician Dr. Towfig Arjmand, M.D., also prepared a Physical Residual Functional Capacity Assessment. R. 111-12. Dr. Arjmand opined that Stone could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; could stand and/or walk six hours in an eight-hour workday; could sit six hours in an eight-hour workday; could occasionally climb ladders, ropes, and scaffolds, and could occasionally crawl; but was otherwise not limited physically. R. 111-12.

On July 10, 2014, Stone saw her therapist Ronald W. Kanwischer, LCPC, CADC, for psychotherapy. R. 1026-27. Stone reported a sad mood, irritability, and poor sleep. Stone said she got "furious at times." Stone told Kanwischer, "she called the on call resident" and "got no satisfaction and they called the police." She said the resident ruined her trust in them. R. 1026. On examination, Stone's speech was normal, her insight and judgment were fair, her affect was irritable, her mood was dysphoric and congruent with her affect, and her thought process was linear/goal-directed. R. 1027. Kanwischer diagnosed depression major recurrent moderate, borderline personality disorder, and anxiety disorder. Kanwischer assigned a GAF score of 55. R. 1026.

On July 31, 2014, Stone saw therapist Kanwischer for psychotherapy. R. 1028-29. Stone said she struggled with irritability and lashing out. She

had trouble sleeping.  She said she frequently became tearful.  She said,

"[C]annabis made some positive difference."  R. 1028.  On examination,

Stone's insight and judgment were fair, her affect was irritable, her mood

was depressed, and her thought process was linear/goal-directed.

Kanwischer diagnosed anxiety disorder; borderline personality disorder;

major depressive disorder recurrent episodic partial/unspecified remission.

Kanwischer assigned a GAF score of 60.  R. 1028.

On August 18, 2014, Stone completed a Disability Report Field Office

form.  R. 296-303.

> My back cramps and hurts whenever I do anything.  Walking,
> standing, sitting.  I can't sleep well and I feel depressed
> because I am alone.  My head hurts daily.  I don't seem to have
> control over anger.  I would seriously rather beat someone's
> ass than get along when I feel they are stupid or annoying.

She said she was "sick and tired," and, "I want to get better but don't know

how."  Stone said she hardly went anywhere "because everything hurts or

angers me."  She said she felt out of control with her anger.  She said she

was seeing a therapist, "but it doesn't seem to help."  R. 298.  Stone said,

"All I do is sit.  I don't have any energy to do anything.  Clean my house or

myself."  She said,

> I cancel appointments because I can't physically or mentally get
> up and go. I sit. I try to walk in my alley but my back cramps up
> and my ankle locks up. I find it hard to even call and make an

appointment and I don't know why. Filling this stuff out right now is about ready to make me crazy. I feel like a freak.

R. 302.

On August 20, 2014, Stone saw SIU psychiatric resident Dr. Malathi Pilla, M.D. R. 1030-31. Stone was dissatisfied that she was still seeing a resident because she requested to be seen by an attending physician. She said she was "really pissed off" because she was seeing a resident again. She said none of the medication was helping. She said she had problems controlling her anger. She said, "I am always like this and like to explode." She said she called the on-call resident on June 28, 2014, and he sent the police to do a wellness check. She was upset that the police were called. She started to use obscene language in reference to the on-call resident. She started accusing Dr. Pilla and walked out of the clinic. R. 1030. Dr. Pilla diagnosed depression, major, recurrent, moderate; and borderline personality disorder. Dr. Pilla assigned a GAF score of 55. SIU sent Stone a letter telling her that she could come to the SIU psychiatric clinic again, but she would be seen by residents. It was explained to Stone in the letter that SIU was a teaching hospital and, as such, it may not be possible to be seen directly by attending physicians. R. 1031.

On August 24, 2014, Stone saw physician's assistant Nicholas Eley, PA, at the St. John's Hospital pain management clinic. R. 1096-99. Since

2012, Stone had gone to the St. John's emergency room 36 times for pain medication to treat migraine headaches, abdominal pain, and chest pain. Eley advised Stone that the emergency room could not manage chronic pain. Eley told Stone that she would not receive any narcotics while in the emergency room after an initial round of narcotics. Stone became aggressive. She "yelled in my face saying 'YAH.. I AM A FUCKING PAIN SEEKER.' 'YOU DON'T HAVE TO BE SO FUCKING COCKY.' 'I DON'T COME HERE TO GET FUCKING HIGH'" (emphasis in the original). Eley told Stone he was not being cocky. Eley told Stone it was not in her best interest to have multiple providers prescribing pain medication. Eley told Stone he would administer any lifesaving medication except morphine because it was not warranted at the time. R. 1097.

On August 27, 2014, Stone saw Kanwischer for psychotherapy. R. 1032-33. Stone told Kanwischer that she did not like being seen by a resident at SIU. Stone said she did not like making eye contact with people any more. On examination, Stone's insight was fair, her judgment was clouded, her affect was irritable, her mood was dysphoric, and her thought process was linear/goal-directed. R. 1033. Kanwischer diagnosed anxiety disorder; borderline personality disorder; and major depressive disorder

recurrent episodic partial/unspecified remission. Kanwischer assigned a GAF score of 55. R. 1032.

On September 3, 2014, Stone saw Dr. Pilla. R. 1034-36. Stone said she was having difficulty falling sleeping and staying asleep. She felt like "wanting to snap everyone and always feels irritable." She related that her medication Ativan was not helping. Stone was ambivalent about trying other medication, but agreed to try clonazepam. She said she has not been able to go to church. On examination, Stone's speech was normal, her insight was limited, her judgment was impaired, her affect was irritable, her mood was dysphoric, and her thought process was linear/goal-directed. R. 1035. R. Dr. Pilla diagnosed major depressive disorder recurrent episodic partial/unspecified remission; anxiety disorder; and borderline personality disorder. Dr. Pilla assigned a GAF score of 55. R. 1034.

On September 23, 2014, Stone saw Kanwischer for psychotherapy. Stone's husband Jerry Stone came to the session. Jerry Stone said that Stone was "very, very sad much of the time, increasingly irritable and gets mad at the drop of a hat." Stone said that doctors did not treat her well. She also said she was "afraid of the meds," and "I don't want to be a zombie." R. 1037. On examination, Stone's insight was fair, her judgment was fair, her affect was gloomy, her mood was depressed, and her thought

process was linear/goal-directed.  R. 1038.  Kanwischer diagnosed anxiety disorder; obsessive-compulsive disorder; borderline personality disorder; and major depressive disorder recurrent episodic partial/unspecified remission.  He assigned a GAF score of 55.  R. 1037.

On October 1, 2014, Stone saw psychiatric resident Dr. Pilla.  R. 1039-41.  Stone said she was still have problems sleeping.  Stone refused to accept any changes in her medications.  R. 1039.  On examination, Stone's insight and judgment were fair, her affect was labile, her mood was "frustrated and tired," and her thought process was linear/goral-directed.  R. 1040.  Dr. Pilla diagnosed major depressive disorder, recurrent, episodic, partial/unspecified, remission; anxiety disorder; and borderline personality disorder.  Dr. Pilla assigned a GAF score of 60.  R. 1039.

On October 1, 2014, the same day, Stone saw Kanwischer for psychotherapy.   R. 20142-43.  Stone said Kanwischer was not helping her.  Kanwischer said that her anger put people off as well as her other behaviors.  He suggested cognitive behavior therapy.  On examination, her insight and judgment were fair, her affect was gloomy, her mood was dysphoric, and her thought process was linear/goal-oriented.  R. 1043.  Kanwischer diagnosed major depressive disorder recurrent episodic

partial/unspecified remission; obsessive-compulsive disorder; and anxiety disorder.  Kanwischer assigned a GAF score of 60.  R. 1042.

On January 14, 2015, Stone saw Dr. Pilla.  R. 1050-52.  Stone said she had good days and bad days, but a majority were bad.  She was not comfortable to talk about the stressors in her life.  On examination, Stone's insight and judgment were limited, her affect was labile, her mood was grumpy, and her thought process was linear/goal-directed.  R. 1051.  Dr. Pilla diagnosed major depressive disorder recurrent episodic partial/unspecified remission; anxiety disorder; and borderline personality disorder.  Dr. Pilla assigned a GAF score of 60.  R. 1050.

On January 20, 2015, Stone saw Kanwischer for psychotherapy.  R. 1053-54.    Stone said "I think I'm broken, my brain doesn't work,"  "My sadness is always there."  Stone thought an inpatient stay at the McFarland mental health facility in Springfield, Illinois, would help her.  She said that psychotherapy was not "answer enough."  On examination, Stone's insight and judgment were fair, her affect was gloomy, her mood was depressed, and her thought process was linear/goal-directed.  R. 1054.  Kanwischer diagnosed major depressive disorder recurrent episodic partial/unspecified remission; borderline personality disorder, and anxiety disorder. Kanwischer assigned a GAF score of 60.  R. 1053.

On February 4, 2015, state agency psychologist Dr. David Voss, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. R. 125-26, 129-31. . Dr. Voss opined that Stone had affective disorder such as depression and anxiety disorders. Dr. Voss indicated that Stone had mild restrictions on daily activities, and moderated difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. Dr. Voss noted that Stone had no episodes of decompensation of extended duration. R. 125.

Dr. Voss also opined that Stone was moderately limited in her ability to carry out detailed instructions. Dr. Voss stated that Stone could remember locations and work-like procedures, and can understand, remember, and carry out short simple instructions. Dr. Voss additionally opined that Stone was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination or proximity with others without being distracted. R. 129-30.

Dr. Voss noted that Stone was moderately limited in her ability to complete a normal workday and workweek. Dr. Voss explained that Stone had difficulty with detailed instructions and maintaining concentration and attention, but she was capable of performing simple tasks. R. 130

Dr. Voss opined that Stone was moderately limited in her ability to interact with the public.  R. 130.  Dr. Voss indicated that Stone had the capacity to understand, remember, and carry out the sustained performance of routine simple work tasks throughout a normal workday, interact with supervisors/coworkers and adapt to changes associated with a typical competitive work environment, within the noted limitations.  R. 130.

On February 11, 2015, Stone completed another Function Report-Adult form.  R. 309-17.  Stone stated that she could not stand or walk for any length of time.  She said, "My right ankle swells and gets stuck in position.  My back cramps from just standing and my stomach has terrible pains every day."  She continued, "Mentally—I get too anxious to go out and I get overwhelmed by any small task.  I get either angry or sad and end up cutting myself or burning myself.  I hate feeling out of control."  R. 309.

Stone said during a typical day she got dressed and sat in her recliner.  She fed and watered the cat.  She did not go a day "without crying from feeling crazy and in pain."  She had a hard time falling asleep at night and staying asleep.  R. 310.

Stone said she did not shower daily because she did not do anything.  She said she did not care about taking care of her hair.  She said that her ankle has locked up on her when she wanted to go to the bathroom and

has had bowel movements before she made it to the bathroom. She said she did not need reminders to take care of herself or to take her medication. She did not cook. She said her husband Jerry Stone did all the cooking. Stone swept the kitchen floor, vacuumed and dusted. She said her husband did the vacuuming sometimes when her ankle hurt too much. She did not do yard work. She went out on the porch every night. R. 310-12.

Stone reported that she drove and could go out alone. She shopped once a month at Walgreens to pick up prescriptions and sometimes buy other items. She could not pay bills because she could not focus. R. 312.

Stone and her husband went out to dinner once a month with a couple who were their friends. She did not go anywhere else except to doctors' appointments. R. 313. Stone said she had problems getting along with others, "Some days I hate everyone. I hate barking dogs, fighting neighbors, family who take and never give." She said, "I don't do much of anything. I feel crazis (sic) and in pain always." R. 314.

Stone said,

Any physical exertion hurts my back, stomach and ankle. My vision has gone from readers to bifocals. Sometimes I want to stop talking and sometimes I have sensory overload & just cover my ears. My memory is crap after being hit in the head with a shot put. I want to hurt people physically when they are nasty to me or someone else who is nice.

Stone stated that she could walk to her next-door neighbor's without needing to rest. She said whether she could pay attention depended on the topic and whether she was "sad that day." She finished what she started and could follow written instructions. She noted that she sometimes needed spoken instructions to be repeated. She got along with authority figures. She could not handle stress or changes in routine. R. 314-15.

Stone said she had some unusual behaviors,

I can handle cutting and burning myself. I don't do it to die, just to feel better. But I do get scared that I am going to have to seriously beat someone's fucking face in for being a smart ass. I don't treat people like shit, so they best not do it to me.

R. 315.

Stone said she used crutches, a walker, a cane, a brace or splint, and a scooter. She said that all were prescribed in the previous few years. She said she used the scooter when she went anywhere that required walking. She used the cane when her ankle "is acting up but isn't stuck." She used the brace to keep her ankle "non-moving." R. 315.

On February 26, 2015, state agency physician Dr. David Mack, M.D., completed a Physical Residual Functional Capacity Assessment of Stone. Dr. Mack agreed with Dr. Arjmand's June 30, 2014, assessment. R. 128-28.

On March 9, 2015, Stone saw her new primary care physician, Dr. Kenneth Schmidt, M.D. Dr. Schmidt was not affiliated with SIU. R. 1215-18. Stone complained of stomach pain. R. 1215. On examination, Stone's abdomen was tender. Stone's gait and station were normal. Her joints, bones, and muscles were normal. She was oriented, but her mood and affect were abnormal, crying and upset. R. 1218. Dr. Schmidt prescribed acetaminophen-codeine. R. 1218.

In May 2015, Stone completed a Disability Report-Appeal form. R. 320-30.[2] Stone reported:

> My stomach hurts always and I've lost 40 lbs since then. I still can't walk far or stand long because of the osteoarthritis in my right ankle. My depression is horrible. I can't control the emotions I experience daily. I get so sad sometimes and then other times I get unreasonably angry. I'm a Christian and I feel terrible because how can I be a good example of Jesus when I can't control the urge to beat someone's face in? I am an embarrassment. I cut and set fire to my arm so I can release the anger or sadness. I don't want to die but I can't live like this. I just need help.

R. 321.

On June 17, 2015, Stone saw Dr. Pilla. R. 1209-11. She agreed to let a medical student observe in the examination room. When the student interviewed her she gradually became upset and very irritable. Stone

[2] The Disability Report-Appeal form is undated. Stone stated on the form that she attended a medical appointment on May 8, 2015, and had a next scheduled appointment on May 21, 2015. R. 322, 324. Based on these dates, Stone completed the form sometime between May 8 and May 21, 2015.

repeated that "she has to go through my records, so need not ask me all these questions." Stone described her mood as "OK." She said her main problem was falling and staying asleep. She said she was "on and off snapy (sic) and feels like slapping or hitting people on their face," but would not do so. On examination, Stone's insight was poor, her judgment was impaired, her affect was irritable, and mood was "ok," and her thought process was linear/goal-directed. R. 1210. Dr. Pilla diagnosed anxiety disorder; major depressive disorder recurrent episodic partial/unspecified remission; and borderline personality disorder. Dr. Pilla assigned a GAF score of 60. R. 1209.

On July 29, 2015, Stone saw Kanwischer for psychotherapy. R. 1207-08. Stone said she was very low. She said her stomach pain "was going to kill" her. R. 1207. On examination, Stone's insight was fair, her judgment was clouded, her affect was tearful, her mood was depressed, and her thought process was circumferential. R. 1208. Kanwischer diagnosed mood disorder, not otherwise specified; borderline personality disorder; and anxiety disorder. Kanwischer assigned a GAF score of 60. R. 1207.

On August 12, 2015, Stone saw neuropsychologist Dr. Chad Noggle, Ph.D., for a neuropsychological evaluation. R. 1382-88. Stone told Dr.

Noggle she had problems with being agitated and unable to control outbursts of anger. At 17, she was "the type that if you crossed her she would 'F*** you up and just do evil S** to you.'" R. 1382 (redactions in the original). Stone said her "fuse is much shorter now." R. 1382. Dr. Noggle noted that during his evaluation, "she became upset with me and reported an internal desire to stab me in my eye and F*** me up." R. 1383 (redaction in the original). Stone told Dr. Noggle that she was always on edge and lost control of herself easily. R. 1383.

Stone said that her ability to sustain attention and concentrate had declined. She said her long-term memory remained good. She said she had not experienced any changes in her skills at language, reasoning, or problem solving. Stone indicated that she suffered from depression. She cut herself for a feeling of release. She stated that she had not cut herself for five or six months. She was uncomfortable in social situations. R. 1383.

Dr. Noggle found in his evaluation that Stone had normal intelligence, average to above average attention and concentration skills, average or above average learning and memory skills, average language skills, normal visual and spacing analytical skills, and average executive functions skills. R. 1384-85. Dr. Noggle found significant problems with depression and

anxiety, as well as problems associated with borderline personality disorder.  R. 1385-87.  Dr. Noggle concluded that Stone's cognitive functions were performing within normal limits with no sign of any lasting effects from any brain injury.  Dr. Noggle diagnosed major depression, generalized anxiety disorder, posttraumatic stress disorder (PTSD), and traits consistent with borderline personality disorder.  R. 1387-88.

On August 19, 2015, Stone saw SIU psychiatric resident Dr. Klran Munir, M.D.  R. 1204-06.  Stone said she came for medication refills.  She indicated her mood was okay.  She had not cut herself in the last six months.  On examination, Stone's speech patterns were slow, her insight was limited, her judgment was fair, her affect was constricted, her mood was euthymic, and her thought process was linear/goal-directed.  R. 1205. Dr. Munir diagnosed major depressive disorder recurrent episodic partial/unspecified remission; anxiety disorder; and borderline personality disorder.  Dr. Munir assigned a GAF score of 60.  R. 1204.

On September 23, 2016, the Lead Pastor of Stone's church, Fred Prince wrote a letter on behalf of Stone.  Prince said that he had known Stone for 11 years and had counseled her in many situations.  Prince stated that Stone's ability to handle "the responsibilities of life [had] gotten progressively worse."  Medical and professional treatment "has had little

success." He said that Stone had dramatic mood swings, chronic pain, and

irregular sleep patterns. Prince opined, "The combination of these factors

has made it impossible, by my estimation, for her to function productively in

a work setting." R. 351.

On September 27, 2016, Kanwischer wrote a letter regarding Stone.

R. 1391. Kanwischer stated that Stone was a victim of sexual abuse as a

child by her mother's boyfriend. Kanwischer summarized his assessment

of Stone:

> When I was introduced her clinically . . . she came to me with
> depression, anxiety, chronic pain, and an angry demeanor.
> She continues to suffer from with these symptoms today.
> Currently, she is frequently tearful, has difficulty with motivation,
> lacks energy, has chronic sleep problems, is often anxious, and
> is often irritable. She has not responded, as hoped, to
> medications, and they never completely eliminate her
> symptomatology. It is my opinion that her early childhood
> sexual abuse has impacted negatively her personality
> development, so she has become a person who finds it difficult
> to trust others. She often has contentious relationships with her
> caregivers, she is either asked to leave the practice or fires the
> doctor. She will continually test a relationship, and often the
> other person fails.
>
> Her current diagnoses are; major depressive disorder,
> recurrent, moderate; posttraumatic stress disorder; and
> generalized anxiety disorder.

R. 1391.

On September 28, 2016, Dr. Schmidt prepared forms entitled "Social

Security Administration Listing of Impairments," Rating of Functional

Limitations," "Levels of Work," and "Absenteeism as it Relates to Employment." R. 1367-70. Dr. Schmidt opined that Stone's impairments from her mental conditions of depression and anxiety disorder meet the Social Security Administration's listing of Impairments 12.04.C. R. 1367; see 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listings), § 12.04.C. The Listings list certain degrees of impairments from certain conditions that render an adult person disabled regardless of the person's age, education, or work experience. The form stated that Listing 12.04.C. applies to a person with an affective disorder such as depression or anxiety who has one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

R. 1367. Dr. Schmidt did not indicate which of these three possibilities applied in Stone's case. Dr. Schmidt also did not indicate whether his opinion was documented in his medical records or treatment notes. R. 1367.

Dr. Schmidt further opined that Stone's mental impairments resulted in extreme restrictions of her activities of daily living; extreme difficulties in maintaining social functioning; and extreme difficulties in maintaining concentration, persistence, or pace. Dr. Schmidt additionally opined that Stone had four or more "[e]pisodes of decompensation, each of extended duration (three episodes within one year or an average of once every four months each lasting for at least two weeks)." R. 1368. Dr. Schmidt further opined that Stone was limited to less than sedentary work. R. 1369.

Dr. Schmidt opined that Stone would miss work two or more days per month due to abdominal pain, and would need to take additional breaks during a workday due to her abdominal pain. Dr. Schmidt stated that his diagnosis of Stone's disability was documented in his medical records and treatment notes. Dr. Schmidt stated, "Patient has chronic abdominal pain with intermittent flare ups of severe incapacitating pain. Patient has had complete w/u & seen multiple specialists for this condition. Patient with co-existing depression & is being treated for this also." R. 1370.

<u>THE EVIDENTIARY HEARING</u>

On October 4, 2016, the Administrative Law Judge (ALJ) held an evidentiary hearing in this case. R. 68-103. Stone appeared in person and

with her attorney by videoconference.  Vocational expert Linda L. Jones appeared by telephone.  R. 70.

Stone testified first.  She lived with her husband.  Her children were adults and did not live with her.  Stone said she drove some times to get a prescription or to go to church.  She tried to go to church every week. She said she went two to three times a month.  R. 87-88.  She sometimes had to leave during the middle of services.  She had a GED.  R. 76-77. She said, "Little things just bother me, and they get so big, and sometimes, I have to leave."  R. 88.

Stone said she alleged she was disabled on February 7, 2013 because she quit her job at the bookstore that day.  She worked for 11 and ½ years for the bookstore.  She had not worked or looked for work since. R. 74-76.  Stone stated that she could not work because, "I can't control how I respond or think."  R. 78.  She described her quitting as a "mutual parting."  R. 93.  She said her supervisor put her on the schedule, but she could not go back to work anymore.  She stated, "I mean I loved that job so much, and it changed.  And I couldn't go, and then I just didn't go back."  R. 93.

Stone said she was seeing counselor Kanwischer and Dr. Schmidt. She was taking Zoloft and lorazepam.  The lorazepam worked sometimes,

but the Zoloft did not.  She testified she occasionally smoked marijuana.  She smoked marijuana the day before the hearing.  R. 80-81.

Stone had constant abdominal pain. R. 82.  She said the pain was always at least a 3 one a scale of 1 to 10.  R. 83.  When the pain flared up, the pain went up to a 10.  R. 84-85.  She has been taking new pain medication constantly for the three weeks before the hearing.  She said the pain was "not as bad as constant" on this medication.  R. 82-83.

Stone said she saw her daughter regularly, a few times a week.  She babysat for her daughter's infant child for 30 minutes.  Her husband Jerry Stone was usually with her for longer periods.  Stone could lift the infant.  She said she eventually got abdominal cramps when she held the baby.  The cramps came from scar tissue from her abdominal surgeries.  She said no MRI or other scan confirmed the existence of the scar tissue.  She said they needed to do surgery to find the tissue.  She said no doctor ever agreed to do surgery for her adhesions.  R. 85-86.

Stone said that she and her husband went out to dinner with another couple from church every two weeks.  R. 87.  She planned to go to church weekly, sometimes did not go, "Because sometimes I can't sleep, sometimes my stomach hurts, sometimes I just feel like a stupid basket

case for no reason."  R. 94.  She said she saw her mother once a week.
Her mother usually came to her house to visit.  R. 89.

Stone related that in a normal day, she got up, took her medicine,
and fed the cats.  She then checked Facebook, and tried "to read a little bit
of the Bible."  R. 89.  She said she watched television.  Sometimes she
"watch[ed] outside."  When her husband Jerry came home from work, he
liked to rest.  R. 89-90.  She carried laundry to the washing machine.  Her
husband Jerry Stone cooked and did the laundry.  R. 90-91.  She said Jerry
Stone did the grocery shopping too.  She said she went to grocery store
occasionally to get a specific item she needed.  R. 91.  She prepared
grocery lists for her husband.  R. 91.

Stone and the ALJ discussed her shotput injury and marijuana use:

> A    I think that shotput messed me up.  I really do
> because it changed some stuff. It's been slow, but –
>
> Q    Okay. Say again? What did you say? You think
> what's –
>
> A    I got hit in the head with a shotput.
>
> Q    Okay. When did that happen?
>
> A    It's been about 14 years, but --
>
> Q    Oh.
>
> A    -- things have just gone.

Q      Okay. You don't think it could be the marijuana that's messing you up?

A      No, because I don 't -- I talk to my counselor, my therapist about that, and he said he thought it could benefit me, and I'm not like -- it's if things get so super bad, I will do a little one hit.

Q      Okay.

A      It's not -- you know, and I try to get approved for it, but my doctor's with St. John's Hospital, but no, I'm not rocking the weed.  It's not like that at all.

Q      Okay.

A      I did that back in high school, ma 'am, but not now.

R. 91-92.

Stone and her attorney discussed her scars from cutting herself:

Q      As I'm sitting here next to you, I'm looking at your left arm, and I'm seeing all kinds of cut scars on your left arm. What are those?

A      Those are cut scars.

Q      Who put them there?

A      I'm sorry. It was a good question. I put them there.

Q      You cut -- do you still cut yourself?

A      I try not to anymore, but yeah.

Q      Do you tell people you do that?

A      Well, no.

Q    You don't tell --

A    But they can    I have the scars.  If I do it, I try to hide it now, like on my leg, but it's not to kill.  It just helps me feel better.

Q    How often do you do that?

A    I don't do it often now because I'm trying to -- because I want to be better. And I just don't know what to do.

R. 93-94.

Stone broke her ankle when she was 14.  She was in a group home. She said the authorities at the home did not take her to see a doctor.  She ultimately had surgeries on her ankle.  She got a staph infection in her ankle.  She said, "And now, it's just bone on bone, and they want to fuse it, but I don't want them to because they said it would make my gait funky, and then other things would start hurting.  And I've already got, on my good ankle, bone spurs now."  R. 95.

She related that the problems with her ankle affected her ability to walk. She said:

You know, it just depends on nothing. It -- there's little bone fragments in there that get stuck.  And when that happens, I can't walk at all.  It's like the old skateboard, the wheels when you'd hit a little pebble, it would just stop. That's what my ankle does.  When I'm walking, the bone, they'll stop the joint from moving.  And then, sometimes, I can maybe walk around the block, but sometimes I just can't because it won't do.

R. 95-96.  Stone said her ankle had gotten worse over time.  R. 96.

Vocational expert Jones then testified.  The ALJ asked Jones the following question:

> Q  Okay.  Okay.  I would like you to consider a hypothetical Claimant of the same age, education, and having the same past work as this Claimant.  Limited to a range of light work with only with let's say no ladders, ropes, or scaffolds, occasional stooping, crouching and crawling.  Limited to simple, routine, repetitive tasks, occasional interaction with coworkers and supervisors of a brief and superficial nature.  No tandem tasks and only occasional interaction with the public of a brief and superficial nature. Is there any past work she could perform with that those limitations?

R. 99-100.  Jones said that the person could not perform Stone's past work at the bookstore.  Jones said the person in the hypothetical question could perform other jobs.  Jones listed the jobs of non-postal mail clerk, with 3,700 such jobs in Illinois and 55,000 nationally; retail trade marker, with 9,000 such jobs in Illinois and 240,000 nationally; document preparer, with 3,700 such jobs in Illinois and 88,000 nationally; ticket checker, with 2,800 such jobs in Illinois and 62,000 nationally.  Jones described these jobs as sample jobs that she selected.  R. 100.

Jones opined that the person could not maintain employment if she missed work two days a month.  The person could perform the jobs cited if she could not interact with the public.  Jones stated that the person could not work if she was off task 10 to 20 percent of the time at work.  R. 101-02.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued her decision on January 10, 2017. R. 10-48. The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2

requires the claimant to have a severe impairment. 20 C.F.R. §§

404.1520(c), 416.920(c). If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience. 20 C.F.R. §§

404.1520(d), 416.920(d). To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in the Listings. 20 C.F.R. Part 404 Subpart P,

Appendix 1; 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.
§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th
Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.
2005).

The ALJ found that Stone met her burdens at Steps 1 and 2.  She
had not worked since February 7, 2013.  She suffered from the severe
impairments of a history of hernia repairs, obesity, migraines, depression
anxiety with obsessive-compulsive behaviors, borderline personality
disorder, degenerative disc disease, and post-traumatic arthritis of the right
ankle.  R. 12.  The ALJ found that Stone did not present any evidence of a
medically determinable impairment for her abdominal pains.  The ALJ
relied on records of Stone's hospital stay from March 7-11, 2014, for the
assessment that her hernia problems were not the cause of her complaints
of abdominal pain.  R. 12, 886-933.

The ALJ found at Step 3, that Stone's impairments did not meet or equal a Listing. The ALJ considered the Listings 12.04, 12.06, and 12.08 for affective disorder (depression), anxiety, and personality disorders. The ALJ found that Stone had mild restrictions on activities of daily living. The ALJ relied on the Adult Function Reports from Jerry Stone and her, as well as her testimony, to find that she engaged in many daily activities: she watched television and used a computer; she helped take care of her cats; she had no problems with personal care; she made sandwiches and heated left-overs; she vacuumed, dusted, and swept kitchen floors; she drove by herself; she went places alone; she worked puzzles and read; and she had friends over for dinner once a week.

The ALJ found that Stone had moderate difficulties in maintaining social functioning. The ALJ again relied on the Adult Function reports and testimony. The ALJ relied on the fact that she interacted regularly with family and friends, she went out to dinner regularly, and she went to church regularly. R. 15-16. The ALJ found that Stone's "borderline personality disorder causes significant problems with social functioning," but her overall activities and abilities to interact with people supported a finding of moderate difficulties. R. 16-17.

The ALJ found that Stone had moderate difficulties in maintaining concentration, persistence, or pace. The ALJ relied on the Adult Function reports that she could engage in activities on the computer, could take care of herself and household activities such as sweeping without help, she finished what she started, and could follow written instructions. The ALJ also relied on Dr. Noggle's neuropsychological report that she had average cognitive abilities. The ALJ also found that the medical records did not document problems with concentration, persistence or pace. R. 17-18. The ALJ found no evidence of decompensation of an extended period. R. 18. The ALJ also found that Stone's mental condition was not so extreme as to leave her unable to function outside her home. R. 18-19.

At Step 4, the ALJ found that Stone had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) except no more than occasional stooping, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; simple, routine, repetitive tasks; occasional interaction with coworkers and supervisors of a brief and superficial nature; no tandem tasks; and occasional interaction with the public of a brief and superficial nature.

R. 19. The ALJ summarized Stone's medical history in detail to support this finding. R. 19-45. The ALJ also relied on the numerous medical examinations that showed normal gait and station. The ALJ relied on the

lack of any scans or other tests to explain Stone's claims of back, abdominal, or headache pain. The ALJ also relied on the opinions of Drs. Arjmand, Mack, Tin, and Voss. The ALJ additionally relied on Dr. Noggle's findings of normal cognitive abilities. The ALJ noted Stone's ability to maintain relationships with family and friends and to attend church. The ALJ found that this evidence showed that Stone "has some ability to conform her behavior when she so chooses." R. 45-46.

The ALJ considered the letters from Kanwischer and Pastor Prince. The ALJ found that Dr. Schmidt's opinions deserved "essentially no weight." R 43. The ALJ found that Dr. Schmidt's opinions were inconsistent with the other evidence in the record and were not supported by evidence in the record. The ALJ noted that Dr. Schmidt did not offer a rationale for his opinions other than his opinion regarding absenteeism. The ALJ found that the opinion regarding absenteeism was inconsistent with records of her visits with Dr. Schmidt in March and August 2016, in which Stone said she was doing pretty well and dealing with her pain. R. 43-44.

Based on Stone's age, education, experience, and RFC, the ALJ found at Step 4 that Stone could not return to her prior work at the bookstore. R. 46. At Step 5, the ALJ found that Stone could perform a number of jobs that exist in the national economy. The ALJ relied on the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Jones. The ALJ found that Stone could perform the representative jobs of mail clerk, retail trade marker, document preparer, and ticket checker. The ALJ concluded that Stone was not disabled. R. 47-48.

Stone appealed the decision of the ALJ. On August 11, 2017, the Appeals Council denied her request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Stone then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ does not have to mention every piece of evidence, but must articulate at least minimally her analysis of all relevant evidence.  See e.g., Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The ALJ's decision that Stone did not meet or equal Listings 12.04, 12.06, and 12.08 for affective disorders (depression), anxiety, or borderline personality disorder was supported by the opinions of Drs. Tin and Voss; some 18 treatment notes by Stone's therapist Kanwischer, psychiatrists, and psychiatric residents who assigned her GAF scores of 55-60, consistently indicating moderate symptoms or moderate functional limitations; Dr. Noggle's findings of average cognitive ability; Stone's ability to leave home by herself and drive by herself; Stone's ability to go out regularly to dinner with friends and to go to church regularly; and Stone's ability to maintain

ongoing social relationships with friends and family.  The Court recognizes that the American Psychiatric Association no longer recommends the use of GAF scores.  These mental healthcare professionals, however, assigned GAF scores and thereby expressed their consistent opinions that Stone had only moderate symptoms or functional limitations.  Those consistent opinions supported the ALJ's conclusion that Stone's impairments did not meet or equal these Listings.

The ALJ's RFC finding was supported by numerous normal physical examinations; by the numerous normal CT scans, MRI scans, and other tests; and by the opinions of Drs. Arjmand and Mack, Tin, and Voss; by Stone's activities and ongoing relationships with friends and family; and by the numerous findings by Stone's mental health professionals that she had moderate symptoms or functional limitations from her mental impairments.

The RFC finding and the opinions of vocational expert Jones supported the ALJ's determination at Step 5 that Stone could perform a significant number of jobs that existed in the national economy.  The decision was supported by substantial evidence.

Stone argues that the ALJ failed to build an accurate and logical bridge from the evidence to the conclusion regarding Stone's psychiatric issues.  The Court disagrees.  The ALJ carefully listed all of the records of

Stone's mental health treatment and noted the consistent GAF scores between 55 and 60, indicating moderate symptoms or limitations. The ALJ also carefully reviewed Stone's activities, including her regular dates with friends and her ongoing relationship with friends and family. The ALJ also discussed the opinions of Drs. Tin and Voss. The ALJ adequately explained how this evidence supported her conclusion.

Stone cites records that she claims show the ALJ was wrong. Stone effectively asks the Court to reweigh the evidence. This the Court will not do. The record provides substantial evidence to support the ALJ's conclusions regarding Stone's psychiatric issues.

Stone also argues that the ALJ erred by not giving controlling weight to Dr. Schmidt's opinions. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[3] In this case, the ALJ found that Dr. Schmidt's opinions were not supported by evidence in the record. Substantial evidence supports this

---

[3] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). This claim was filed on February 3, 2014. As such, the amendments do not apply here.

conclusion. Dr. Schmidt opined that Stone met Listing 12.04.C for affective disorders. That Listing of Impairments form completed by Dr. Schmidt stated that the listing required a finding of one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

R. 1367. The ALJ correctly noted that Dr. Schmidt cited no evidence to support the required finding of any of the three conditions listed above, and the ALJ found that Stone had none of these conditions. R. 43. Substantial evidence supports the ALJ's finding. Stone blew up and cursed at people who were principally her medical providers. However, she did not decompensate for extended periods, such as days or weeks at a time. She did not lose control and decompensate when she went out of the house. She drove herself places alone without difficulty. She also did not live in a highly supportive living arrangement. She lived with her husband in a private residence. Substantial evidence supported the ALJ's decision not to give weight to this opinion of Dr. Schmidt.

Dr. Schmidt also opined that Stone was extremely limited in her abilities to maintain activities of daily living, social functioning, and concentration, persistence or pace. The ALJ found that Dr. Schmidt did not explain the basis for these opinions and his opinions were not consistent with the evidence in the records. Substantial evidence supported the ALJ's conclusion. Again, Stone's therapist, psychiatrists, and psychiatric residents all consistently assessed Stone with moderate limitations or moderate symptoms. None ever rated her condition as extreme. Drs. Tin and Voss also rated her limitations as moderate or mild. Stone's activities showed that she could maintain relationships, go out with friends, and go to church regularly. All this evidence was inconsistent with Dr. Schmidt's assessment of extreme limitations. The ALJ also properly stated that the evidence showed no episodes of decompensation of extended periods. The evidence supported the ALJ's decision to reject this opinion.

Dr. Schmidt opined that Stone was limited to less than sedentary work. The ALJ rejected this opinion because Dr. Schmidt did not provide any explanation for this opinion and the opinion was inconsistent with evidence in the record. This decision was supported by substantial evidence. The opinion was supported by examination records that showed relatively normal physical examination; the scans, such as MRI, CT, and x-

rays, that showed nothing abnormal except the arthritis in her ankle and the possible beginnings of some problems with her hernia repairs; the opinions of Drs. Arjmand and Mack; and Stone's daily activities that showed some physical abilities. The ALJ did not err in rejecting this opinion.

Lastly, Dr. Schmidt opined that Stone would miss work two or more days a month and require extra breaks. The ALJ rejected this opinion as inconsistent with the treatment notes of Stone in 2016 and other evidence in the record. The finding was supported by substantial evidence. Stone told Dr. Schmidt in March 2016, "[S]he has been doing pretty well. She still has flare-ups of abdominal pain, takes an occasional Dilaudid, and it seems to get her through." R. 1299. Drs. Arjmand and Mack opined that she could stand and/or walk for six hours, and sit for six hours, in an eight-hour workday. Drs. Tin and Voss opined that she could perform a limited range of unskilled work. Dr. Noggle found that she had no cognitive deficits. All this evidence supported the ALJ's decision to reject Dr. Schmidt's opinions. The ALJ did not err.

Stone argues that the ALJ did not give any weight to Kanwischer's letter or Pastor Prince's letter. The ALJ considered Kanwischer's letter with the other evidence. Kanwischer, however, did not offer any opinions regarding Stone's functional limitations. The ALJ discounted Pastor

Prince's opinions because he was not a medical source. The ALJ relied on the medical opinions and evidence instead. The ALJ was entitled to make that assessment and the Court will not reweigh this evidence. The Court finds no error.

Stone argues last that the ALJ did not consider whether her frequent doctor's appointments and other treatment would preclude her from working. The Court disagrees. The ALJ is required to articulate minimally her analysis of the material relevant evidence. Herron, 19 F.3d at 333. The ALJ is not required to speculate. Stone is speculating on what she would have done had she been working. If Stone had been working, she might have scheduled her medical appointments on her days off or combined appointments. No one knows. No one knows because this argument is all speculation. The ALJ did not err in omitting such speculation from her decision.[4] If numbers of doctors' visits alone could establish disability, claimants would only need to schedule enough visits. See Hoppa v. Colvin, 2013 WL 5874639, at *5 (W.D. Wis. October 31,

---

[4] A claimant's condition may require repeated, time-consuming medical procedures that could reasonably be expected to require regular absences from work. See e.g., Gille v. Colvin, 2016 WL 1125819, at 13 (C.D. Ill. February 22, 2016) (Claimant's condition required a doctor to debride necrotic tissue under local anesthesia once every three weeks in order to be able to work). Davis did not present evidence of required regularly scheduled, time-consuming medical treatments.

2013). The Court will not reverse the ALJ's decision based on Stone's speculation.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 21) is ALLOWED; Plaintiff Jamie Kathleen Stone's Motion for Summary Judgment (d/e 17) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED. All pending motions are denied as moot. THIS CASE IS CLOSED.

ENTER: October 18, 2018

_____s/ *Tom Schanzle-Haskins*_____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE\